**United States Court of Appeals**

**FOR THE EIGHTH CIRCUIT**

_____

No. 96-2923/3083

_____

United States of America,      *

                              *

        Plaintiff - Appellee,   *

                              *  On appeal from the United States

    v.                      *  District Court for the Southern

                              *                      District

of Iowa.

Robert J. Darrah,        *

                              *

        Defendant - Appellant.  *

_____

Nos. 96-2924

_____

United States of America,      *

                              *

        Plaintiff - Appellee,   *

                              *  On appeal from the United States

    v.                      *  District Court for the Southern

                              *  District of Iowa.

Saundra L. Darrah,       *

                              *

        Defendant - Appellant.  *

_____

Submitted:  January 15, 1997

Filed:  July 14, 1997

_____

Before WOLLMAN and FLOYD R. GIBSON, Circuit Judges, and MONTGOMERY,[1]
     District Judge.
_____

FLOYD R. GIBSON, Circuit Judge.

Appellant Robert Darrah challenges a jury's finding that he made false statements to a lending institution, see 18 U.S.C. § 1014 (1994), misapplied bank funds, see id. § 656, engaged in a monetary transaction involving property unlawfully derived from the misapplication of bank funds, see id. § 1957, and made a false statement to an agency of the United States, see id. § 1001. Appellant Saundra Darrah, Robert's spouse, similarly challenges her conviction for making a false statement to an agency of the United States. See id.

I.   BACKGROUND

Robert Darrah was a Certified Public Accountant ("CPA") whose company, Darrah & Company, serviced tax returns and managed investments in Council Bluffs, Iowa. During the 1980s and early 1990s, Robert became directly involved with a bank holding company called Missouri Valley Financial Services ("MVFS"), which owned stock in several banks in and around Council Bluffs. In the mid-1980s, MVFS received a bank stock loan from Norwest Bank ("Norwest") in Des Moines for the purpose of purchasing stock in Peoples National Bank ("PNB") in Council Bluffs. The shareholders of MVFS, including Robert, personally guaranteed the bank stock loan. At the time, Robert was the president of MVFS and consequently controlled the overall operations of the holding company and the various banks it owned, including PNB. One of his responsibilities was to make loan payments to Norwest on behalf of MVFS.

_____

[1]The HONORABLE ANN D. MONTGOMERY, United States District Judge for the District of Minnesota, sitting by designation.

-2-

In 1987, Darrah & Company began preparing tax returns for Dianna Smith. When Smith retired in 1990, Robert offered to help her invest her retirement funds which totaled just over $400,000. Smith stressed to Robert that she desired to place the bulk of her funds in low-risk investments. After discussing various options, Smith requested that Robert invest $300,000 in an annuity, $100,000 in growth funds, and about $5,000 in a "holding company fund." To facilitate the process of transferring the funds to the desired investments, Smith, upon Robert's request, signed several money transfer forms in blank and wrote a check to PNB for the entire amount of her retirement fund. Linda Hack, the IRA supervisor at PNB, opened an IRA in Smith's name. Because Smith requested that Robert supply her with minimal paperwork, Hack structured the account so that Robert, rather than Smith, received the statements and correspondence regarding the account. Therefore, from the time she turned her money over to Darrah in 1990 until early 1994, the only information Smith received pertained to her growth fund investments.

Howard Stoffa, a special agent with the criminal investigation division of the Internal Revenue Service ("IRS"), testified at trial concerning the results of an investigation of Robert and certain transactions involving MVFS. Stoffa testified that Dianna Smith deposited her check into her IRA on May 30, 1990. On July 20, 1990, $300,000 was withdrawn from Smith's account. Stoffa did not trace the funds to an annuity, as Smith had authorized, but discovered that the $300,000 was used to purchase a cashier's check payable to MVFS. Also on July 20, Robert signed a check from an MVFS bank

account made payable to Norwest in the amount of $255,579.28. Prior to Smith's check being deposited into the MVFS account, the balance in the account was $54,569.07. Stoffa stated that in his opinion, the $300,000 from Smith's account was used to pay the loan at Norwest because prior to the deposit of those funds, the MVFS account did not have sufficient funds to make that payment. Smith testified that she did not authorize Robert to invest her funds in such a manner.

In 1994, Smith requested a meeting with Robert to obtain documentation of her investments. Robert provided her with a notebook which included, among other things, a handwritten note authorizing $300,000 to be invested in holding company funds and a promissory note signed by Dale Ward, an MVFS director and Saundra Darrah's brother, indicating that MVFS owed the Dianna Smith IRA $300,000. Smith testified that she did not authorize such an investment and that the initials indicating authorization must have been forged. Ward testified that he prepared the promissory note between MVFS and Smith's IRA at Robert's direction. Smith, obviously upset that a large portion of her retirement funds had been invested in a manner inconsistent with her wishes, retained an attorney and eventually recovered the $300,000, plus ten percent interest.

The Federal Reserve Board ("FRB") is responsible for regulating bank holding companies. The FRB had determined that because MVFS was highly leveraged, it would not be permitted to acquire additional debt. In late 1990, the FRB began an inspection of MVFS to confirm that it was operating in conformance with applicable regulations. In March of 1992, Robert signed and submitted an FR Y-6 Annual Report for MVFS to the FRB. The FR Y-6 showed a $300,000 transaction which was reported by Robert as a shareholder contribution from himself, rather than as a loan to MVFS from Smith's IRA. At trial, FRB Examiner Mary Beth Tystahl examined the note obligating MVFS to repay Smith's IRA and determined that it signified a loan from Smith's IRA to MVFS in the amount of $300,000. Tystahl testified that the FR Y-6 provided by Robert was false because it did not

accurately reflect the source of the $300,000 based on the promissory note, and she also testified that the source of funds was significant because it substantially changed the level of MVFS's indebtedness.

Robert and Saundra maintained a $45,000 credit line at PNB. The bank kept a loan file containing relevant information concerning the Darrahs' financial status. The file contained a personal financial statement, along with copies of the Darrahs' 1989, 1990, and 1991 tax returns. Charles Schumacher, PNB's senior loan officer from

January 1987 until October 1992, testified that it was the normal business practice for banks to request copies of potential loan customers' financial statements and tax returns to assess their ability to repay loans. Schumacher stated that he assumed customers would present "accurate" copies of their tax returns. The 1989 return Robert submitted to PNB, as well as two other banks, reported an adjusted gross income of $236,393, while the 1989 return provided to the IRS reported an adjusted gross income of $147,357. Similarly, Robert provided Norwest Bank Nebraska, N.A. with a 1992 tax return which reported an adjusted gross income of $62,312, while the 1992 return Robert submitted to the IRS listed his adjusted gross income as $33,312. Pamela Reicks, a revenue agent with the IRS, testified that during her service with the IRS, she has never known anyone to file a draft return without notifying the IRS of its draft status.

Saundra Darrah owned one-half of a company called Saun Gi, Incorporated ("Saun Gi"). She also owned one hundred percent of a gas station and convenience store called Darrah's Apco, which the Darrahs' financial statement valued at $750,000. Internal Revenue Officer James Daugherty testified that Saun Gi owed the IRS approximately $84,000 in unpaid unemployment withholding taxes. After Daugherty determined that Saundra was responsible for the taxes, he requested a collection information statement (IRS Form 433) from her to determine her ability to repay the debt. On October 8, 1993, Saundra's attorney provided Daugherty with an IRS Form 433 on Saundra's behalf. Saundra signed the form immediately beneath the declaration that she would be

subject to penalties for perjury if the statements in the form were not true. The form required Saundra to list any investments, stocks, or securities. On the line requesting this information Saundra's form stated "none." Thus, Saundra failed to report her interest in Darrah's Apco. Daugherty testified that he relied on the information in the form to devise a schedule for Saundra to pay the $84,000 debt. Daugherty stated had he known of Saundra's interest in Darrah's Apco, it would have influenced his collection methods.

Based on the facts presented at trial, the jury convicted Robert of four counts of making false statements to financial institutions, see 18 U.S.C. § 1014, one count of misapplying bank funds, see id. § 656, one count of engaging in a monetary transaction involving property derived from the misapplication of bank funds, see id. § 1957, and one count of knowingly making a false statement to the Federal Reserve Board, see id. § 1001. The jury convicted Saundra of knowingly making a false statement to the IRS. See id. Robert and Saundra filed motions for judgment of acquittal which the district court[2] denied. Both defendants appeal their convictions.

## II. DISCUSSION

### A. Robert Darrah

#### 1. Instructional errors

Robert appears to raise two instructional issues on appeal. First, Robert asserts that the district court committed error when it "fail[ed] to specifically instruct the jury that materiality is one of the essential elements" of 18 U.S.C. § 1014. Robert's Br. at 18. However, this argument is precluded by the Supreme Court's recent decision that materiality is not an essential element of § 1014. See United States v. Wells, 117 S. Ct. 921, 929 (1997).

---

[2]The HONORABLE CHARLES R. WOLLE, Chief United States District Judge for the Southern District of Iowa.

Robert also seemingly claims error in the district court's failure to amend Instruction 19, which listed the elements of 18 U.S.C. § 656. Instruction 19 required the jury to determine whether Robert "was an officer of [PNB]." Robert's App. at 35. At the instruction conference, the district court agreed, upon the Government's request, to amend the instruction to inquire whether Robert was either an officer or a director

of PNB. The district court failed to make the agreed upon amendment, and Robert claims error in that failure. Because Robert did not raise this issue prior to his appeal, we review for plain error. See United States v. Robinson, 110 F.3d 1320, 1324 (8th Cir. 1997).[3] We note that Instruction 18 includes the language of § 656 which states that a person "connected in any capacity" with the institution, including an officer or a director, can be found guilty of misapplication of funds. See Robert's App. at 34. Therefore, after viewing the instructions as a whole, we conclude that the district court adequately instructed the jury on the law of § 656.

### 2. Sufficiency of the evidence

Robert challenges the sufficiency of the evidence presented on each of the counts for which he was convicted. When considering the sufficiency of the evidence, we consider the evidence in the light most favorable to the guilty verdict. See United States v. Wade, 111 F.3d 602, 604 (8th Cir. 1997). We must give the Government "the benefit of all reasonable inferences that might be drawn from the evidence," United States v. Darden, 70 F.3d 1507, 1517 (8th Cir. 1995) (quotation and citation omitted), cert. denied, 116 S. Ct. 1449 (1996), and "[w]e will reverse a conviction for insufficient evidence and order the entry of a judgment of acquittal only if no construction of the evidence exists to support the jury's verdict," id. After considering the evidence in this light, we conclude that the Government presented sufficient evidence to support Robert's convictions.

---

[3]Under the plain error standard, reversal is warranted if "(1) the court committed an error; (2) the error is clear under current law; and (3) the error affects the defendant's substantial rights." Robinson, 110 F.3d at 1324 (quotation, alteration, and citation omitted).

In counts two, three, four, and five, the Government charged Robert with making false statements[4] in violation of 18 U.S.C. § 1014.[5]  For each of the banks in question, Robert submitted a tax return as part of a loan approval process.  At trial, the Government established that the returns submitted to the banks did not bear the same figures as the returns Robert filed with the IRS.  For example, the 1989 return Robert submitted to three of the banks reported his adjusted gross income as $263,393, while the 1989 return Robert submitted to the IRS reported his adjusted gross income as $147,357.  Robert claims the Government failed to prove that the returns he provided to the banks were false; rather, the evidence merely established that the bank returns differed from those submitted to the IRS.  Therefore, Robert postulates that the only method for the Government to prove the falsity of his statements was to establish that he somehow asserted to the banks that the returns he provided to them were identical to those he submitted to the IRS.  Robert concludes that because he never made such an assertion, the Government did not establish that he made false statements.  We do not agree with Robert's portrayal of the Government's case.

---

[4]The indictment charged Robert with making false statements to the following banks:  PNB in Council Bluffs; PNB in Avoca, Iowa; State Bank and Trust in Council Bluffs; and Norwest Bank Nebraska, N.A. (collectively, the "banks").

[5]Section 1014 provides:

> Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by the Federal Deposit Insurance Corporation, . . . upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1014 (1994).

We conclude that the differences between the bank returns and the IRS returns were sufficient to establish that Robert made false statements. Indeed, the disparity between the returns established that both could not be true statements. Additionally, the IRS returns were signed by Robert under penalties of perjury. Therefore, a reasonable jury could have concluded that because the bank returns substantially differed from the IRS returns, the bank returns were false. True, a reasonable jury also could have inferred that because the IRS returns differed from the bank returns, the IRS returns were false, but that is not likely because the defendant was to submit true copies of his returns to the IRS. Under the sufficiency of the evidence standard, we must reverse the conviction "only if no construction of the evidence exists to support the jury's verdict." Darden, 70 F.3d at 1517.[6] Because a reasonable jury could have concluded that Robert Darrah submitted false returns to the banks, reversal is not warranted.

Robert also contends that the evidence presented at trial was insufficient to sustain his conviction under 18 U.S.C. § 656.[7] Robert contends that the Government did not present any evidence that he "was in any way connected to the transfer of the $300,000." Robert's Br. at 21. He further argues that even if he was connected to the

---

[6]Robert similarly argues that the Government failed to prove the materiality of his statements. In light of the Supreme Court's decision in Wells, 117 S. Ct. at 929, such proof was not necessary.

[7]Section 656 provides:

> Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, depository institution holding company, [or] national bank . . . embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both . . . .

18 U.S.C. § 656 (1994).

transfer of funds, his involvement was not in his capacity as a director of PNB. We first note that this Circuit has not explicitly determined whether § 656 requires "evidence that 'bank funds were misapplied by virtue of the fact the defendant was connected in some capacity with a bank which enable[d] him to gain access to bank funds.'" United States v. Marx, 991 F.2d 1369, 1372 (8th Cir.) (quoting United States v. Dreitzler, 577 F.2d 539, 547 (9th Cir. 1978), cert. denied, 440 U.S. 921 (1979)), cert. denied, 510 U.S. 1018 (1993). We need not decide this issue in the present case because we conclude that the evidence was sufficient to establish Robert's connection to the misapplication of bank funds in his capacity as a director of PNB.

Smith specifically requested that Robert invest $300,000 of her retirement funds in an annuity and only $5,000 in a bank holding company such as MVFS. Nonetheless, within months of Smith's opening an IRA at PNB, $300,000 was transferred from her account to MVFS. While Linda Hack testified that Dale Ward requested the transfer of funds, Ward stated that he knew nothing of the illegal nature of the transaction, and he prepared the promissory note between the Smith IRA and MVFS at Robert's direction. Furthermore, Robert, a director of PNB and MVFS, wrote the check from MVFS to Norwest, thus utilizing the funds from Smith's IRA. The Government's evidence was sufficient to allow a reasonable jury to conclude that Robert was able to coordinate the transaction between the Smith IRA and MVFS through his position as a director.[8]

---

[8]Robert was convicted under 18 U.S.C. § 1957 for engaging in a monetary transaction involving property derived from the willful misapplication of bank funds. Robert's sole argument on appeal concerning this conviction is that because the evidence did not establish that he willfully misapplied bank funds under § 656, he could not have engaged in a transaction involving those funds under § 1957. Because we have concluded that the evidence was sufficient to sustain Robert's conviction under § 656, Robert's § 1957 argument likewise fails.

Finally, Robert argues that the evidence was insufficient to support his conviction for making a false statement under 18 U.S.C. § 1001.[9] We disagree. The FRB had determined that MVFS would not be permitted to undertake any additional indebtedness because it was already highly leveraged. The FRB monitored MVFS's financial stability through annual FR Y-6 reports which listed the company's various debts and other financial occurrences. In 1992, Robert submitted the FR Y-6 to the FRB on behalf of MVFS. The report indicated that Robert had made a $300,000 shareholder contribution to MVFS. The report did not indicate that MVFS had become indebted to the Dianna Smith IRA in the amount of $300,000. Robert contends that he did not submit a false report by failing to list the $300,000 as a loan from Smith to MVFS because the loan was not authorized by Smith or by the MVFS board of directors, and therefore, the Government failed to present evidence that MVFS had a binding obligation to repay Smith. We disagree. The note was not, as Robert claims, between himself and the Smith IRA. Rather, the promissory note evidenced an obligation on the part of MVFS to pay the Dianna Smith IRA $300,000. The evidence was sufficient to allow the jury to conclude Robert falsely reported the $300,000 loan as a shareholder contribution on the FR Y-6 when it was actually a loan to MVFS.

---

[9]Section 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1001 (1994).

**B.    Saundra Darrah**

Saundra Darrah argues that the evidence presented at trial was not sufficient to support her conviction under 18 U.S.C. § 1001.  On October 8, 1993, Saundra submitted a signed IRS Form 433 to the IRS in order for the IRS to assess her ability to pay $84,000 in past due withholding taxes.  On the line requesting securities interests, the form stated "none."  However, a financial statement submitted to Norwest Bank by Robert and Saundra Darrah reported that Saundra owned one hundred percent of Darrah's Apco which was valued at $750,000.  The financial statement was signed by Saundra on October 31, 1993.  Though Saundra admits signing the Form 433, she argues that the Government failed to establish that she made a false statement because it did not prove that she had knowledge of the contents of the form.  Her argument is largely based on the fact that her husband and attorney completed the Form 433 on her behalf.  However, just as a taxpayer cannot avoid liability for submitting a false tax return by having another complete it for her, see United States v. Walker, 896 F.2d 295, 299 n.9 (8th Cir. 1990), she likewise cannot escape fault for submitting a false Form 433 by displaying a reckless disregard for the contents of the document, see United States v. Puente, 982 F.2d 156, 159 (5th Cir.), cert. denied, 508 U.S. 962 (1993).  Saundra submitted a signed financial statement to Norwest Bank reporting her interest in Darrah's Apco just three weeks after submitting the Form 433 to the IRS.  She was the sole owner of the business.  Certainly, the evidence was sufficient for the jury to conclude that Saundra knew of her interest in Darrah's Apco and should have reported it on her Form 433.

Saundra also contends that her conviction resulted in a violation of her Fifth Amendment right to due process because her guilty verdict was inconsistent with her husband's acquittal on the same charge.  This argument is without merit because "[i]t is well established that consistency of a jury's verdicts is not necessary."  United States v. Finch, 16 F.3d 228, 230 (8th Cir. 1994); accord Hamling v. United States, 418 U.S. 87, 101 (1974).

-16-

**III. CONCLUSION**

For the reasons discussed above, we affirm the decision of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.