**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Mark Kevin HICKS, Defendant–
Appellant.**

No. 99–10352.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 2, 2000

Filed June 12, 2000

As Amended on Denial of Rehearing
July 31, 2000

Doron Weinberg and Nina Wilder, Weinberg & Wilder, San Francisco, California, for the defendant–appellant.

John Hemann, Assistant United States Attorney, San Francisco, California, for the plaintiff–appellee.

Before: WOOD, Jr.,[1] KLEINFELD, and GRABER, Circuit Judges.

[1] The Honorable Harlington Wood, Jr., Senior United States Circuit Judge for the Seventh Circuit, sitting by designation.

GRABER, Circuit Judge:

Defendant Mark Kevin Hicks was convicted by a jury of making false statements to a federally insured financial institution, in violation of 18 U.S.C. § 1014. On appeal, he contends that the evidence was insufficient to support his convictions, that the jury instructions were inadequate, that the district court erred in admitting certain evidence, and that the district court misapplied the Sentencing Guidelines. We affirm the judgment of conviction, but vacate the sentence and remand for further proceedings.

## FACTS

We recount the relevant facts in the manner most favorable to the jury's verdict. Between 1988 and 1990, Defendant applied for nine loans from Glendale Federal Savings Bank (Glendale Federal).[2] Each loan was to fund Defendant's purchase of a particular piece of real property. Because he was self-employed, Defendant was required to submit copies of his last two federal income tax returns in support of each loan application. A bank officer explained at trial that "by a tax return, we mean a complete set of 1040's that have been filed with the IRS [Internal Revenue Service]."

Concerned that his 1987 and 1989 tax returns reflected insufficient income to ensure approval of his various loan applications, Defendant asked his professional tax preparer to create different "tax returns" for those two years. The tax preparer took blank 1040 forms, filled in the total adjusted gross income amounts desired by Defendant for each of the two years, and then worked backward from those amounts to create real-looking tax forms for submission to Glendale Federal. Defendant, his wife, and the tax preparer each signed the completed forms, and the preparer stamped each form "Taxpayer's Copy." We refer to those documents as the

"Glendale returns" to distinguish them from Defendant's actual tax returns that had been filed with the IRS.

Defendant submitted one of the two Glendale returns in connection with each of his loan applications, and the loans all were approved. Eventually, Defendant defaulted on all nine loans. After default, Glendale Federal foreclosed on the various loans. The foreclosure sales, conducted by a third party engaged by Glendale for that purpose, did not generate enough funds to repay fully the various loans at issue. Consequently, Glendale Federal lost hundreds of thousands of dollars on its loans to Defendant.

Based on his submission of the Glendale returns to Glendale Federal, Defendant was indicted on nine counts of making false statements to a federally insured financial institution, in violation of 18 U.S.C. § 1014. After being convicted by a jury, he was sentenced to 33 months of incarceration and ordered to pay restitution. He timely appeals his conviction and sentence.

## DISCUSSION

### A. *Sufficiency of the Evidence*

■ Defendant first contends that the government failed to present evidence sufficient to prove that he made false statements to Glendale Federal. He also contends that the government failed to present evidence sufficient to prove that Glendale Federal was federally insured at the relevant times. We may reverse a jury's verdict due to insufficiency of the evidence only if, viewing the evidence presented at trial in the light most favorable to the prosecution, no rational juror could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

---

**2.** In 1988 and 1989, Glendale Federal was a savings and loan association. In 1990, it became a savings bank. That change is not material to the issues on appeal.

### 1. *False Statements*

At trial, Defendant conceded that the income figures contained in the Glendale returns were different than the income figures contained in his IRS-filed tax returns, but he attempted to prove that the figures in the Glendale returns reflected his "true" income. In other words, Defendant contended that, although he may have lied to the IRS, he did not lie to the bank and, therefore, could not be convicted of making false statements to a financial institution.

 The government sought to prove at trial that Defendant made two sorts of false statements to Glendale Federal. First, the government contended that, by presenting the Glendale returns in response to the bank's request for copies of two of his federal income tax returns, Defendant implicitly, and falsely, stated that the Glendale returns were copies of the actual 1040 forms that Defendant had filed with the IRS. Second, the government suggested that, in each of the nine loan applications at issue, Defendant falsely stated the amount of income that he derived from either rental payments or interest. The evidence presented at trial was sufficient to support the jury's verdict under both theories.

(a) *The Glendale returns were not copies of Defendant's actually filed IRS tax returns.*

The Glendale returns were IRS 1040s, signed by Defendant and his wife, and had been completed by a professional tax preparer and stamped "Taxpayer's Copy." The jury reasonably could have concluded that, by submitting those carefully prepared documents in response to the bank's request for Defendant's last two tax returns, Defendant falsely stated that the documents were copies of the tax forms that he had filed with the IRS.

 Defendant does not dispute that the jury reasonably could have made such a finding. Instead, he contends that, as a matter of law, that finding is insufficient to support his convictions for violating § 1014.[3] He relies on *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), and *United States v. Waechter*, 771 F.2d 974 (6th Cir.1985). Both cases are distinguishable.

In *Williams*, the Supreme Court considered whether knowingly depositing a check that is drawn on insufficient funds amounts to the making of a false statement for purposes of § 1014. The government argued in *Williams* that a depositor "is generally understood to represent" that she has sufficient funds on hand to cover every check that she writes, but the Court disagreed:

> [A] check is literally not a "statement" at all.... [W]hatever the general understanding of a check's function, "false statement" is not a term that, in common usage, is often applied to characterize "bad checks." And, when interpreting a criminal statute that does not explicitly reach the conduct in question, we are reluctant to base an expansive reading on inferences drawn from subjective and variable "understandings."

*Williams*, 458 U.S. at 285–86, 102 S.Ct. 3088. Critical to the Court's holding was its conclusion, based on a lengthy analysis of the legislative history of § 1014, that "it would require statutory language much more explicit than that before us here to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the deposit of bad checks." *Id.* at 290, 102 S.Ct. 3088 (internal quotation marks omitted).

The distinctions between *Williams* and this case are fundamental. As noted above, the Supreme Court held in

---

**3.** We review de novo Defendant's claim that his convictions were based on a legally invalid interpretation of 18 U.S.C. § 1014. *See United States v. Sarkisian*, 197 F.3d 966, 984 (9th Cir.1999)("The district court's interpretation of a criminal statute and the scope of the conduct covered by the statute is a question of law reviewed de novo.").

*Williams* that the defendant's act of depositing a check contained no implied representation concerning the state of the depositor's bank balance. Here, there is no similar implied representation. By providing the Glendale returns at the time and in the manner that he did, Defendant directly (albeit through assertive conduct) stated that the documents were copies of his federal income tax returns for the two relevant years. That statement was false: The documents were not *copies* of anything, let alone copies of Defendant's federal income tax returns for the two years preceding his Glendale Federal loan applications. Instead, they were newly completed 1040 forms designed to *look like* copies of Defendant's federal income tax returns.[4]

Accordingly, the complex arguments considered by the Court in *Williams* simply do not bear on the much more straightforward facts of this case. This case would be analogous to *Williams* if Defendant had submitted genuine copies of his actual income tax returns, and the government's prosecution were based on a theory that those returns contained an implied representation that Defendant had paid the taxes showed as owing (when he had not paid).

Moreover, a finding that Defendant falsely represented that the Glendale returns were the same returns that he had filed with the IRS need not be based on a subjective or generalized understanding of either loan applications or tax forms. Rather, the finding easily can be based on the particular course of conduct engaged in by Defendant, including his submission

of the Glendale returns in response to the bank's request for copies of his last two tax returns and the tax preparer's use of a "Taxpayer's Copy" stamp.

Finally, the Supreme Court in *Williams* considered a prosecution theory that "would [have made] a surprisingly broad range of unremarkable conduct a violation of federal law." *Williams*, 458 U.S. at 286, 102 S.Ct. 3088. In those circumstances, the Court concluded that the conduct at issue—passing bad checks—had nothing to do with the evils that Congress sought to prohibit when it enacted § 1014. By contrast, we deal here with "remarkable" conduct, and there is no risk that our holding will federally criminalize a vast array of everyday transactions. In fact, the very legislative history considered by the Court in *Williams* makes clear that Defendant's acts are exactly the sort of misconduct that Congress sought to criminalize by enacting § 1014: "[Section] 1014 was described [by Congress] as barring 'false statements or willful overvaluations in connection with applications, loans, and the like.'" *Williams*, 458 U.S. at 289, 102 S.Ct. 3088 (quoting S.Rep.No. 1078, 88th Cong. 2d Sess. 1 (1964), U.S.Code Cong. & Admin.News 1964, p. 2519).

*Waechter* is equally inapplicable. In that case, the defendant submitted multiple bids on properties owned by the Department of Housing and Urban Development. He used shills to make the bids, however, "in a manner that did not reveal that [he] controlled all the bids." *Waechter*, 771 F.2d at 975. The government prosecuted the defendant under 18 U.S.C. § 1010, which prohibits making false state-

---

4. This case does not require us to determine the precise definition of the term "return" under federal tax law. The cases and regulations make clear that, at a minimum, a document must have been presented to the IRS in "an honest and reasonable attempt to satisfy the requirements of the tax law" in order to qualify as a return. *Williams v. Commissioner*, 114 T.C. No. 8 (Mar. 1, 2000) (internal quotation marks omitted) (explaining the Tax Court's four-part test for determining whether a filing qualifies as a "return"). A bogus

1040 form that never was presented to the IRS serves no purpose under the tax law and does not qualify as a "return." *Cf. United States v. Hindenlang (In re Hindenlang)*, 164 F.3d 1029, 1035 (6th Cir.1999) ("We conclude that if a document purporting to be a tax return serves no purpose at all under the Internal Revenue Code, such a document cannot, as a matter of law, qualify as an honest and reasonable attempt to satisfy the requirements of the tax law. Therefore the document is not a 'return' ....").

ments to HUD. The government alleged that the false statement was "the false impression created by [the defendant's] concealment of his submission of multiple bids for a single property as an undisclosed princip[al]." *Id.* at 977 (internal quotation marks omitted).

The Sixth Circuit held that the defendant had made no false statement, because he neither expressly nor impliedly told HUD that he was not using agents to place bids on his behalf. Moreover, because no HUD policy or regulation prohibited the defendant from using shills, the defendant could not be convicted for falsely implying that he was submitting bids in compliance with HUD rules. *See id.* at 978–80. By contrast, here, there is no need to imply a requirement to submit a genuine tax return; Glendale Federal asked specifically for copies of his last two tax returns. *Waechter* would be analogous to this case only if HUD had employed a bid form stating "one bid per customer."

Thus, consistent with *Williams* and *Waechter*, the jury could have convicted Defendant based on his implicit statement that the Glendale returns were copies of his actually filed IRS tax returns.

(b) *In his loan applications, Defendant falsely stated the amount of rental income and interest income that he received each month.*

Defendant does not challenge the legal validity of this theory of liability. Instead, he argues that, based on the evidence presented at trial, no rational juror could have found that he falsely stated the rental and interest income amounts. We disagree.

In two of the nine loan applications, Defendant reported that he had a monthly rental income loss of roughly $2,000. In the other seven applications, Defendant

showed that he had no monthly rental income at all. Additionally, in seven of the applications, Defendant stated that he received $8,000 a month in interest income. The government contended at trial that all those figures were false.[5]

In support of that contention, the government submitted Defendant's actual tax returns for the relevant years, which reflected that Defendant reported to the IRS substantially higher rental income losses and substantially lower interest income than he reported to Glendale Federal. The IRS returns, of course, were signed under penalty of perjury. In addition, the government presented the testimony of Defendant's tax preparer, who explained how the actual tax returns were prepared; he testified that he believed that the IRS returns were "true and accurate reflection[s] of [Defendant's] income and expenses."

Defendant countered with the expert testimony of a forensic accountant, who opined that the income figures in Defendant's loan applications and in the Glendale returns were more accurate than the income figures in Defendant's IRS tax returns. Accordingly, the evidence was in conflict on this point. However, evidence need not be undisputed to support a jury's verdict. The evidence in the record sufficed to support a jury finding that Defendant falsely stated to Glendale Federal his monthly rental income in each of the nine applications and falsely stated his interest income in seven of the nine applications. *See United States v. Nash,* 115 F.3d 1431 (9th Cir.1997); *United States v. Darrah,* 119 F.3d 1322 (8th Cir.1997).

## 2. *Federally Insured Status*

Defendant next contends that the government failed to prove that, at the time of

---

**5.** Defendant contends on appeal that the government "has all but conceded it could not prove that the Glendale returns contained any facially false assertions or omissions." That interpretation of the government's position is incorrect. The government conceded at trial

that Defendant's expert witness was well qualified and that Defendant had committed tax fraud by understating his income to the IRS. It did not concede that the IRS returns were wholly false, nor that the Glendale returns were facially accurate.

the offenses in question, Glendale Federal was a federally insured financial institution covered by § 1014. We view the record differently.

■ A bank employee's "uncontradicted testimony of a bank's insured status can sufficiently support the jury's conclusion that this element was proven beyond a reasonable doubt." *United States v. Corbin,* 972 F.2d 271, 272 (9th Cir.1992). The government presented the testimony of a bank officer who stated that Glendale Federal was federally insured at the relevant times. No evidence in the record contradicts the officer's testimony and, indeed, the testimony was corroborated by the certificates of insurance produced by the government. The evidence was sufficient to prove that, at the relevant times, Glendale Federal was federally insured.

### B. *Adequacy of the Jury Instructions*

■ Defendant also argues that the district court erred in failing to define the terms "false" and "statement" for the jury. We review de novo whether the jury instructions accurately define the elements of a statutory offense and whether the jury instructions adequately cover a defendant's proffered defense. *See United States v. Gergen,* 172 F.3d 719, 724 (9th Cir.1999); *United States v. Iverson,* 162 F.3d 1015, 1022 (9th Cir.1998). We review for abuse of discretion the district court's ultimate formulation of the instructions. *See United States v. Frega,* 179 F.3d 793, 806 n. 16 (9th Cir.1999). "The trial court has substantial latitude so long as its instructions fairly and adequately cover the issues presented." *Id.*

■ At trial, Defendant requested a jury instruction defining the term "statement" as an "oral or written assertion of fact that can be characterized as 'true' or 'false.'" The government, on the other hand, requested an instruction telling the jury that, as a matter of law, submitting a tax return in support of a loan application is a "statement."

Defendant also requested an instruction defining "false":

The word "false" means contrary to the truth. As used in the law, the word "false" generally means more than an innocent mistake or a simple error of fact. A statement is "false" if it was untrue when made and was then known to be untrue by the person making it or made with reckless indifference as to its truth or falsity.

The district court declined to give either party's requested instruction on the meaning of the term "statement," and the court similarly declined to give Defendant's requested instruction defining the term "false." Rather, the district court simply instructed the jury that the government was required to prove beyond a reasonable doubt that Defendant "made a false statement to Glendale." We find no error.

■ As an initial matter, the district court need not define common terms that are readily understandable by the jury. *See United States v. Dixon,* 201 F.3d 1223, 1231–32 (9th Cir.2000) (holding that "the court did not err by failing to define 'commercial advantage' and 'private financial gain' because these are common terms, whose meanings are within the comprehension of the average juror"); *United States v. Moore,* 921 F.2d 207, 210 (9th Cir.1990) (holding that, "[s]ince 'violence' is a concept within the jury's ordinary experience, there is no prejudice in failing to define it"); *United States v. Hernandez–Escarsega,* 886 F.2d 1560, 1571–72 (9th Cir.1989) (holding that, for purposes of a prosecution for a continuing criminal enterprise, the statutory terms "organizer," "supervisor," and "manager" "are neither outside the common understanding of a juror, nor so technical or ambiguous as to require a specific definition") (citation and internal quotation marks omitted).

■ Moreover, the instructions proffered by Defendant were not legally accurate. It simply is not correct that a "statement" must be "oral or written," as

Defendant's own authority, *Waechter*, makes clear. *See Waechter*, 771 F.2d at 978 (stating that a factual assertion that is a false statement "may be either *express or implied*.") (emphasis added). Similarly, it is not correct that a statement is "false" only if the person making the statement knows that it is false. A defendant's knowledge of falsity is a different issue than the fact of falsity, as the instructions given by the district court properly made clear.

Finally, the instructions ultimately given by the district court left ample room for the defense to proffer its theory of the case.[6] Nothing in the instructions foreclosed Defendant from presenting his chosen defense.

### C. *Admissibility of Cardenas' Testimony*

■■■ Additionally, Defendant asserts that the district court erred in admitting the testimony of Alec Cardenas under Federal Rule of Evidence 404(b). We review the court's ruling for abuse of discretion. *See United States v. Castillo*, 181 F.3d 1129, 1134 (9th Cir.1999).

**6.** The district court defined the elements of the offense as follows:

> In order for [Defendant] to be found guilty of the offense charged, the government must prove each of the following elements beyond a reasonable doubt:
>
> (1) [Defendant] made a false statement to Glendale;
>
> (2) [Defendant] made the false statement to Glendale knowing it was false;
>
> (3) [Defendant] made the false statement for the purpose of influencing in any way the action of Glendale.
>
> . . . . .
>
> For each count, it is not sufficient that some member of the jury agree that one statement is false while others of the jury agree that another statement is false. There must be at least one specific statement in each count that each of you agree is false and that each of you agree the defendant knew to be false.

**7.** The district court gave the following limiting instruction:

■■■ Cardenas testified that Defendant reviewed his loan application and told Cardenas that he did not have enough income to qualify for a loan. To solve this problem, Defendant suggested that Cardenas consider whether he "knew anybody who had a business who could possibly assist [him by] stating [he] worked for them to show additional income." As a result of this conversation, Cardenas obtained from a friend a document that falsely showed that he had earned roughly $20,000 at the friend's business. According to Cardenas, Defendant also secretly loaned him $25,000 for a down payment and assisted him in concealing that information from the bank.

At the conclusion of Cardenas' testimony, the district court instructed the jury that it could not consider that testimony when determining whether Defendant had made a false statement to Glendale Federal. If, however, the jury concluded, based on other evidence, that Defendant had made a false statement, it could consider Cardenas' testimony when determining whether Defendant, by making that false statement, intended to influence the actions of Glendale Federal.[7] During closing argument, the government properly stressed this same point.[8]

> This testimony, as I am sure you observed, listening to it, does not relate to the transactions or events involved in the charges against the Defendant that I have outlined for you. And . . . you should not, therefore, consider this evidence in connection with deciding whether the Defendant committed the acts of which he stands accused in this case.
>
> But if you find from other evidence, that is, evidence other than Cardenas' testimony, that the government has proved that the Defendant made false statements to Glendale Federal, then you may consider the Cardenas testimony as it bears on Defendant's intent to influence the action of Glendale Federal. But you may not consider Cardenas' testimony for any other purpose.

**8.** The government argued:

> The testimony of Alec Cardenas. It's not an important part of this case. And you have been instructed that the testimony of Alec Cardenas can only be considered by

The district court did not abuse its discretion in admitting Cardenas' testimony for the limited purpose of proving Defendant's intention to influence the actions of Glendale Federal. Although Defendant argues on appeal that his intent was not contested during trial, the government was obligated to prove beyond a reasonable doubt that Defendant intended to influence the actions of the bank. In view of that valid, non-character purpose for which Cardenas' testimony was admitted, and in the light of the limiting instruction given and the government's responsible treatment of the evidence during closing argument, there was no error.

## D. *Sentencing Issues*

Under the Sentencing Guidelines, the base offense level for a violation of § 1014 is six. *See* U.S.S.G. § 2F1.1(a).[9] The district court determined that Glendale Federal had lost $659,326 in connection with Defendant's fraudulent activities and therefore increased the offense level by ten points under U.S.S.G. § 2F1.1(b)(1)(K). The district court further increased the offense level by two points because the offense involved more than minimal planning, *see* U.S.S.G. § 2F1.1(b)(2)(A), and by two points because Defendant was an "organizer, leader, manager, or supervisor" of another person during the commission of the offense, *see* U.S.S.G. § 3B1.1(c), resulting in a total adjusted offense level of 20. After declining to decrease the offense level based on Defendant's acceptance of responsibility, *see* U.S.S.G. § 3E1.1, the district court imposed the lowest possible sentence within the resulting Guideline range—33 months.

Defendant contends that the district court erred in calculating the amount of loss caused by his offense, in increasing the offense level based on his supervision of the tax preparer, and in failing to reduce the offense level based on acceptance of responsibility. We review de novo the district court's interpretation of the Sentencing Guidelines, for clear error the district court's factual findings underlying the sentence imposed, and for abuse of discretion the district court's application of the Guidelines to a particular set of facts. *See United States v. Kohli*, 110 F.3d 1475, 1476–77 (9th Cir.1997); *United States v. Barnes*, 125 F.3d 1287, 1290 (9th Cir.1997).

### 1. *Amount of Loss*

"[I]n fraudulent loan application cases, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan." *United States v. Davoudi*, 172 F.3d 1130, 1135 (9th Cir.1999) (internal quotation marks, ellipsis, and emphasis omitted). In this case, Glendale Federal recovered substantial amounts of the loaned funds by foreclosing on the loans and selling the properties that had been pledged as security. Nonetheless, Glendale Federal suffered large losses.

Defendant contends that the person whom the bank hired to sell the properties at issue engaged in criminal misconduct that resulted in the properties' being sold at unreasonably low prices. In other words, Defendant argues that the intervening criminal acts of the foreclosure agent inflated the amount of loss suffered by Glendale Federal and that he should

you after you have made decisions about whether the statements are true or false and whether they were knowingly made. Intent. It goes to intent.

The Defendant knowingly intended to do this.

9. "Due to ex post facto considerations," the district court applied the 1990 Sentencing Guidelines, although Defendant was sentenced in 1999. Both parties concurred in that decision below, and neither party challenges the decision on appeal. Accordingly, we apply the same version of the Sentencing Guidelines, but express no view on the issue of what version of the Guidelines would apply here in the event of a dispute. All references in this opinion are to the 1990 version of the Guidelines.

not have been punished based on the inflated loss amount.

The district court declined to hear evidence or make findings relating to Defendant's claim that the foreclosure agent was a thief, concluding, as a matter of law, based on our opinion in *Davoudi,* that the issue could be dealt with only through a motion for a downward departure. Further, because the court believed that the Guideline sentencing range that resulted from a consideration of Glendale Federal's total loss fairly reflected Defendant's culpability, it declined to depart downward on the basis of the foreclosure agent's alleged misconduct.

*Davoudi* does not control the question of intervening criminal misconduct, however. The defendant in that case did not claim that intervening criminal misconduct, unrelated in any manner to his own crime, inflated the losses suffered by the bank. Rather, in *Davoudi,* the defendant simply claimed that, because the assets at issue had decreased in value between the time his offense was discovered and the time the assets were sold, the district court should have used the higher pre-sale value when computing the loss suffered by the bank. We rejected his argument: "If the bank suffers losses after the offense is discovered because of a falling market or even through its own improvident management, those consequential losses can be attributed to the defendant's conduct for purposes of Guidelines sentencing." *Davoudi,* 172 F.3d at 1135.

Here, Defendant does not claim that the market fell, nor that the bank was improvident, nor even that the bank was grossly negligent. Rather, he contends that, after his crime was complete and fully discovered, a new criminal showed up and committed a different crime, inflicting new losses on the bank. As we understand Defendant's allegations, this case is no different than one in which, on the day of a planned foreclosure sale, an arsonist damages the bank's collateral.

The Guidelines' "relevant conduct" provision requires a defendant's sentence to be based on "all harm that resulted from the acts or omissions" of the defendant. U.S.S.G. § 1B1.3(a)(3). Like the other courts to consider this provision, we believe that the term "resulted from" establishes a causation requirement. *See United States v. Yeaman,* 194 F.3d 442, 457 (3d Cir.1999) ("Section 1B1.3(a)(3) establishes a causation requirement when determining actual loss."); *United States v. Molina,* 106 F.3d 1118, 1123–24 (2d Cir.1997) (holding that causation is established for purposes of U.S.S.G. § 1B1.3(a)(3) when the defendant "put into motion a chain of events that contained an inevitable tragic result" of the relevant harm) (internal quotation marks omitted); *United States v. Fox,* 999 F.2d 483, 486 (10th Cir.1993) (holding that causation is established for purposes of § 1B1.3(a)(3) when the harm was a "direct result" or "flowed naturally" from the defendant's criminal misconduct); *see also United States v. Guillette,* 547 F.2d 743, 749 (2d Cir.1976) ("We find the principle of proximate cause embodied in [18 U.S.C. § 241] through the phrase 'if death results.' ").

New losses inflicted independently by third-party criminals after the completion and discovery of a defendant's crime do not "result from" that crime for purposes of the Sentencing Guidelines, even if the defendant's conduct in some coincidental way was a but-for cause of the ultimate loss. *See generally* 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 3.12(c) & (f)(3) (1986 & Supp.2000) (discussing proximate and intervening causes); *People v. Hernandez,* 82 N.Y.2d 309, 604 N.Y.S.2d 524, 624 N.E.2d 661, 666 (1993) ("When the intervening acts of another party are supervening or unforeseeable, the necessary causal chain is broken, and there is no liability for the [original actor]."); *State v. Munoz,* 233 Conn. 106, 659 A.2d 683, 692 (1995) ("The doctrine of intervening cause, which has deep roots in the law of proximate cause, both criminal

and civil ... refers to a situation in which the defendant's conduct is a 'but for' cause, or cause in fact, of the victim's injury, but nonetheless some other circumstance subsequently occurs—the source of which may be an act of the victim, the act of some other person, or some nonhuman force— that does more than supply a concurring or contributing cause of the injury, but is unforeseeable and sufficiently powerful in its effect that it serves to relieve the defendant of criminal responsibility for his conduct.") (citations and footnote omitted). *See also United States v. Marlatt,* 24 F.3d 1005, 1007 (7th Cir.1994) ("[There is a] difference between 'but for' causation and the causation—for which the presence of but-for causation is ordinarily a necessary condition but rarely a sufficient one—that imposes legal liability. The distinction runs throughout the law. Criminal law is no exception."); *United States v. Spinney,* 795 F.2d 1410, 1415 (9th Cir.1986) ("A basic tenet of criminal law is that the government must prove that the defendant's conduct was the legal or proximate cause of the resulting injury.").

The government does not quarrel with this basic principle, but suggests that the district court need not determine the causation issue as part of the initial loss calculation. Rather, in the government's view, after the victim's "actual loss" has been computed, a defendant may move for a downward departure on the basis that an unforeseeable intervening force has increased the loss for which the defendant is being sentenced. That approach is flawed, however, because it improperly relieves the government of its obligation to prove by a preponderance of the evidence the amount of "harm that resulted from the acts or omissions" of the defendant. Under the Guidelines, the district court must determine the amount of loss caused by

the defendant and the resultant Guidelines' sentencing range *before* considering whether to exercise its discretion to depart from that range. *See* U.S.S.G. § 1B1.1.

This case does not require us to define the outer boundaries of the Sentencing Guidelines' causation requirement. Our holding is a narrow one: For purposes of computing a fraud defendant's adjusted offense level under U.S.S.G. § 2F1.1, losses caused by the intervening, independent, and unforeseeable criminal misconduct of a third party do not "result[ ] from" the defendant's crime and may not be considered.

Because the district court heard no evidence and made no findings with respect to Defendant's allegations that the bank's losses were inflated by the intervening, independent, and unforeseeable criminal misconduct of the foreclosure agent, we are unable to determine whether Defendant's sentence comports with the principles discussed above. Accordingly, we must vacate the sentence and remand for findings concerning the amount of loss caused by Defendant's offenses. Because we vacate the sentence and remand on this basis, we do not consider Defendant's other challenges to the district court's determination of the amount of loss.[10]

### 2. *Other Adjustments*

Defendant also challenges the district court's decision to increase his offense level by two points because he was an "organizer, leader, manager, or supervisor" of the tax preparer who concocted the Glendale returns. U.S.S.G. § 3B1.1(c). We review for clear error, *see United States v. Tank,* 200 F.3d 627, 633 (9th Cir.2000), and find none. The record amply supports the district court's finding that Defendant, at the very least, super-

---

**10.** The district court declined to resolve all the arguments presented by the parties concerning the appropriate items to be included in the loss calculation, because of the court's view that the sentencing range recommended by the presentence report "reasonably reflects the culpability of the Defendant in connection with these transactions." On remand, the district court should make specific findings as to the amount of loss before considering whether the resulting sentence accurately reflects Defendant's culpability.

**1050**

vised the tax preparer in creating the Glendale returns.

 Finally, Defendant contends that the district court erred in refusing to decrease his offense level by two points based on his acceptance of responsibility. We review for clear error, *United States v. Scrivener,* 189 F.3d 944, 947 (9th Cir.1999), and again find none. Defendant presented a complex and elaborate defense, challenging both the legal validity of the government's theory of the case and his factual guilt. Although a defendant who goes to trial in order to challenge the legal validity of the government's theory may, in some cases, be eligible for a reduction of the offense level based on acceptance of responsibility, *see United States v. McKittrick,* 142 F.3d 1170, 1178 (9th Cir.1998), the district court did not clearly err in concluding that this was not such a case.

## CONCLUSION

We AFFIRM the judgment of conviction, but VACATE the sentence and REMAND for further sentencing proceedings consistent with this opinion.