[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13023

_____

D.C. Docket No. 4:12-cr-00017-RH-CAS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KENNETH L. BARBER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(December 2, 2014)

Before HULL and MARCUS, Circuit Judges, and TOTENBERG,* District Judge.

PER CURIAM:

_____

*Honorable Amy Totenberg, United States District Judge for the Northern District of
Georgia, sitting by designation.

After a jury trial, Kenneth L. Barber was convicted of one count of conspiracy to defraud the United States by filing false tax returns, in violation of 18 U.S.C. § 371; six counts of aiding or assisting in the preparation of materially false tax returns, in violation of 26 U.S.C. § 7206(2) and 18 U.S.C. § 2; four counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and three counts of making false statements to a federally insured financial institution, in violation of 18 U.S.C. § 1014. The district court imposed a total sentence of 87 months' imprisonment. After careful review of the record and the briefs, and with the benefit of oral argument, we affirm Barber's convictions and sentences.

## I. FACTUAL BACKGROUND

Defendant Barber's conspiracy, tax fraud, and wire fraud convictions arise out of his ownership and operation of a tax preparation business. Barber and his employees prepared and filed fraudulent income tax returns to maximize their clients' refunds, and thus collect more preparation fees. Barber's false-statement convictions arise out of the discrepancies in reported income and tax between the individual and corporate tax returns he submitted to Wachovia Bank in support of three loan applications and the actual tax returns he filed with the Internal Revenue Service ("IRS").

Because defendant Barber challenges the sufficiency of the evidence as to all of his convictions, we describe the trial evidence in detail.

2

## A.    Barber's Tax Preparation Business: 2006-2009

In order to electronically file tax returns for clients, a tax preparer must obtain an Electronic Filing Identification Number ("EFIN") from the IRS.  In September 2005, Barber applied for an EFIN for his tax preparation business, Kenneth Barber & Associates ("KBA"), but was denied.  Two weeks after the IRS denied Barber's application, Barber's daughter applied for an EFIN and was approved for her tax preparation business, KLB Group Developers, Inc. ("KLB Group").  Barber's daughter then contracted out KLB Group's business to Barber.  All of the fraudulent tax returns submitted electronically by Barber's business were filed using KLB Group's assigned EFIN.

Defendant Barber, who owned and operated both KLB Group and KBA, opened an office on West Brevard Street in Tallahassee, Florida.  Barber hired multiple employees to work in his office as tax return preparers, including Shavita Davis, Anthony Barber ("Anthony"), Hope Wynn, and Shericka Jennings, all of whom testified against Barber at trial.  Before working for Barber, Davis, Anthony, Wynn, and Jennings had no prior experience preparing tax returns.  Barber paid his employees an hourly wage that did not exceed $10 per hour.

Davis worked for defendant Barber from 2005 to 2009.  During her employment, Barber taught Davis how to do the following to client tax returns: reuse fraudulent information from previous years' returns; report false household

3

help ("HSH") income in round numbers such as $2500, $3500, $4500, $5500, $6500, and $7500 to generate the largest possible refund; report false Schedule C[1] income and expenses; inflate wages; create fictitious employee W-2s using employer identification numbers found online; and claim deductions for false dependents. Davis would find dependents to claim on the return and charge the client between $500 and $1500. Barber later told Davis to teach Anthony how to sell false dependents (i.e., "how to hustle").

Defendant Barber told Davis to input $2500 to maximize the education credit on "just about" every return and to falsify other credits, such as childcare expenses and Schedule A deductions. Barber asked Davis to train several other employees how to prepare false returns, including Anthony, Wynn, and Jennings. Barber charged clients higher preparation fees for returns containing false information. When clients questioned the fees, Barber instructed Davis to tell them not to complain because they did not make money anyway.

Anthony, who is not related to defendant Barber, worked for Barber from 2007 to 2010. During Anthony's employment, Barber's office prepared between 500 and 1000 tax returns each year, about 90 percent of which were false. Barber referred clients to Anthony and other employees but also prepared returns himself. Normally, Barber electronically transmitted the returns to the IRS after Davis

---

[1]Self-employed taxpayers report their business income and expenses on a Schedule C form.

reviewed them for errors. All of the preparation fees received from clients went into business accounts controlled by Barber. Clients paid Barber an average of $300 for each return.

Both defendant Barber and Davis trained Anthony to prepare false returns. Though Davis was more "hands-on" in her training, Barber had instructed Davis to train Anthony. On one occasion, Anthony told Barber that he was concerned Davis was stealing because a client gave Davis a large sum of cash. Barber laughed and told Anthony to "tell [Davis] to teach you how to hustle" and "show you what she knows." Davis told Anthony that she had sold that client a false dependent for $1000, a practice Barber referred to as "hustling." Davis and Barber gave Anthony numbers to report as false HSH income, a practice Barber encouraged because it increased the client's refund amount. For the same reason, Anthony was trained to claim the maximum $2500 education credit and falsify other items such as filing status, childcare expenses, and charitable contributions. Barber eventually asked Anthony to train his other employees how to prepare false returns.

Wynn worked for defendant Barber for about six weeks from December 2008 to January 2009. Barber, Davis, and another employee, Meshundra Turner, trained Wynn how to adjust Schedule C income to obtain the highest tax refund, regardless of the amount actually given by the client.

5

Jennings, who worked for defendant Barber from August 2006 to April 2008, was aware that false returns were being prepared at Barber's office. Barber trained Jennings to include false HSH income on tax returns and to claim education credits even if the client did not have an eligible student. While Jennings did not personally sell any false dependents, she knew that other preparers did so.

**B.     IRS Fraud Investigation: 2007-2009**

In December 2007, IRS agent Timothy Evans went to defendant Barber's Brevard Street office to conduct a scheduled compliance check on KLB and KBA. When Evans called to set up an appointment and asked to speak with the owner, the receptionist transferred him to Barber. During the compliance check, Evans did not deal with anyone other than Barber.

As part of the first compliance check, Evans reviewed 100 client files and noticed that 47 of the 100 returns reported a total of $287,000 in HSH income. HSH income, which is income earned from working in someone else's home, is not very commonly reported. When Evans pointed this out, Barber stated that any income from self-employment should be reported as Schedule C income instead. Evans testified that reporting HSH income instead of the same amount of Schedule C income generates a much higher refund.

During Evans's two-day visit, defendant Barber gave his employees a list of clients and instructed them to clean their files of any documents (such as paycheck

6

stubs and W-2s) that were inconsistent with the false information reported on the tax returns filed with the IRS.

Evans's review of the almost 1300 tax returns filed by Barber's business in 2007 revealed several red flags. The 2007 returns reported almost $2.3 million in HSH income in round numbers such as $2500, $3500, $4500, $5500, $6500, and $7500, with many repeated amounts. Evans also noticed that some returns claimed different dependents each year for the same individual. The reported familial relationships, which included many nieces and nephews, were poorly documented and were of questionable eligibility. Yet other returns listed Barber's P.O. Box instead of the client's address. When Evans asked Barber why some of the returns listed his P.O. Box as the address, Barber explained that it was sound business practice to have refunds come back to him to ensure that he received his preparation fees from clients.

After being fined after the IRS's first compliance check, defendant Barber instructed Davis and Anthony to stop using false HSH income and instead use false Schedule C income. Later, Barber taught Davis and Anthony to report false Schedule C expenses as well as false income to make the returns appear more legitimate.

In January 2009, Evans conducted a second, unannounced compliance check on KLB and KBA, during which he met with defendant Barber. This time, Evans

7

did not see any suspicious HSH income but noticed that many returns listed unsupported Schedule C income. The files lacked any supporting documentation from the client of income earned from self-employment or expenses incurred to operate the purported business. During these compliance checks, Evans observed that Barber was in charge of the business and Barber admitted that he trained his tax preparers. After the second compliance check, Evans referred Barber to the IRS's criminal investigations unit.

On November 13, 2009, agents executed a search warrant at defendant Barber's Brevard Street office. Agents seized around 55 boxes of client files and business records, as well as Barber's individual and corporate tax returns.

## C.    2009 Business Lease

Shortly after the execution of the search warrant, defendant Barber arranged for Hillard Goldsmith to take over his tax preparation business. On December 1, 2009, Goldsmith entered into a commercial lease with Barber for the use of Barber's Brevard Street office and client base at a monthly rent of $5000. At Barber's recommendation, Goldsmith hired two of Barber's employees, Anthony and Meshundra Turner, to work as tax return preparers for Goldsmith's business.

Even after executing the December 1, 2009 lease, defendant Barber maintained an office within the Brevard Street building, directly across from Goldsmith's office, and went to that office daily. Barber continued to interact with

clients and participate in the preparation of fraudulent tax returns.  In the beginning of 2010, the IRS learned that returns were being filed from the Brevard Street office using Goldsmith's EFIN after KLB Group's EFIN was expelled.  Goldsmith rented Barber's office space until the spring of 2011.

## D.    Specific False Returns

At trial, the government introduced evidence as to each count of aiding or assisting in the preparation of materially false tax returns and wire fraud against defendant Barber.  The clients, whose false returns were identified in the superseding indictment, testified against Barber.

As charged in Counts 16, 17, 44, and 45, defendant Barber prepared and filed Shereka Green's 2007 and 2008 tax returns.  Barber told Green that he could "boost [the refund amount] up" but did not elaborate.  Green's 2007 return falsely stated Schedule C income, when she did not have her own business.  Green's 2008 return listed false HSH income.  As charged in Counts 7 and 37, Barber prepared and filed Angela Byrd's 2006 tax return, which falsely stated her Schedule C income and expenses and reported false HSH income.  As charged in Counts 21 and 47, Barber prepared and filed Roosevelt Jones's 2006 tax return, which falsely stated his Schedule C income and expenses.  As charged in Count 32, Barber prepared Ninika Washington's 2005 tax return, which falsely stated her income and listed false HSH income.  As charged in Count 12, Barber prepared Janet

Ford's 2006 return, which listed an unknown person as Ford's dependent and claimed a false education expense.

## E.    Estimated Total Loss Amount

In addition to evidence of the specific conduct charged in the superseding indictment, the government presented evidence of the total tax loss that resulted from defendant Barber's fraud scheme.  IRS agent Douglas Franzen reviewed a database of 434 tax returns that reported HSH income, all prepared by Barber's business for the tax years 2006 through 2008.  HSH was a very rare type of income that Franzen did not recall seeing on returns prior to this case.  To calculate the total amount of tax loss, Franzen conducted a statistical sampling of 105 of the 434 tax returns that reported HSH income.  The sampling was then projected onto the total population of 434.  Franzen opined, with 95% certainty, that these 434 returns from tax years 2006 through 2008 resulted in a loss of over $700,000, which was a very conservative estimate.

## F.    Barber's 2006 and 2007 Loan Applications

During the course of the criminal investigation, the IRS obtained copies of defendant Barber's own tax returns.  The IRS learned that Barber submitted his individual and corporate tax returns to apply for three business loans from Wachovia Bank (now known as Wells Fargo Bank), a federally insured financial institution.  The November 13, 2009 search warrant executed at Barber's Brevard

Street office recovered a portion of KBA's 2005 corporate tax return. This recovered return matched the 2005 corporate return in Wachovia's records but not the 2005 corporate return filed with the IRS.

Former Wachovia banker Sherwood Brown processed the loans for Barber, who was the guarantor for loans on behalf of KBA. Wachovia financed Barber's purchase of the Brevard Street office. Barber submitted copies of seven tax returns as proof of income, as required for approval of the loans. Barber submitted his 2005 individual return for the first loan in the amount of $70,000, which closed in August 2006. Barber submitted his 2004 and 2005 individual and corporate returns for the second loan in the amount of $200,000, which closed in December 2006. Barber submitted his 2006 individual and corporate returns for the third loan in the amount of $60,000, which closed in 2007.

The copies of the tax returns Barber submitted to Wachovia Bank reflected substantially greater income than the returns Barber filed with the IRS. Specifically, the differences in reported income between the returns given to Wachovia and the returns filed with the IRS were as follows: (1) $45,256 versus $16,148 (2005 individual);[2] (2) $42,760 versus $20,061 (2004 individual); (3) $84,632 versus negative $3,360 (2004 corporate); (4) $99,923 versus negative $30,077 (2005 corporate); (5) $61,128 versus $16,128 (2006 individual); and (6)

---

[2]As noted above, Barber submitted his 2005 individual tax return to Wachovia Bank on two separate occasions, in connection with both the first and second loans.

$111,917 versus negative $25,648 (2006 corporate).  According to Brown, Wachovia Bank would not have approved the first loan in August 2006 if it had seen the income figures actually reported to the IRS.

On cross-examination, IRS agent Regina Merchant admitted that she could not tell the jury whether the larger income figures in the returns given to Wachovia Bank represented Barber's actual income.  Although the IRS did not investigate Barber's actual income, it was apparent that Barber's business earned substantial income each of the years under investigation.

## II.  PROCEDURAL HISTORY

### A.    Superseding Indictment

Barber, Anthony, and Davis were charged for their involvement in the tax fraud scheme.  After Anthony pled guilty to several counts of tax fraud, the grand jury issued a 58-count superseding indictment against Barber and Davis on June 6, 2012.

The superseding indictment charged defendant Barber with 15 counts: one count of conspiracy to defraud the United States by filing false tax returns (Count 1, or "conspiracy count"); seven counts of aiding or assisting in the preparation of materially false tax returns (Counts 7, 8, 12, 16, 17, 21, and 32, or "tax fraud counts"); four counts of wire fraud (Counts 37, 44, 45, and 47, or "wire fraud counts"); and three counts of making false statements on a loan application to a

federally insured financial institution (Counts 56, 57, and 58, or "false-statement counts"). Count 8 was later dismissed on the government's motion, leaving 14 counts for trial.

## B.    Motion to Sever False-Statement Counts

On December 21, 2012, defendant Barber filed a pre-trial motion to sever the false-statement counts from the conspiracy, tax fraud, and wire fraud counts, pursuant to Federal Rule of Criminal Procedure 14. Barber argued that evidence that he used a "phony tax return to support a bank loan" would greatly prejudice his ability to get a fair trial on the remaining counts.

At a pre-trial conference, the district court stated that severance was "very unlikely." Even if the false-statement counts were severed, the evidence concerning Barber's false statements would likely be admitted under Federal Rule of Evidence 404(b). On April 3, 2013, the district court entered an order denying Barber's motion to sever counts.

Defendant Barber renewed his motion to sever at trial. Again, the district court reasoned that even if it severed the counts, it nevertheless would have allowed evidence that Barber submitted false tax returns to Wachovia Bank as inextricably intertwined with his tax fraud scheme, or at least as relevant to Barber's intent and knowledge of the scheme under Rule 404(b). The denial of severance did not appear to prejudice Barber. The district court reasoned that the

jury should have all of the evidence and it was clear that the jury was "looking at those counts separately as they should."

## C.    Trial

The district court severed Davis's and Barber's trials, and Davis was tried first.  Davis pled guilty to the charges against her during her trial.  Barber proceeded to trial on April 8, 2013.

After closing arguments, the district court instructed the jury on the charged offenses.  In relevant part, to find defendant Barber guilty on the false-statement counts, the government needed to prove the following facts beyond a reasonable doubt: (1) that Barber "submitted a false federal income tax return to a bank as charged in the count under consideration," (2) that Barber "knew the return was false," (3) that Barber "acted with the intent to influence the bank's action on his loan request," and (4) that "the bank's deposits were insured by the Federal Deposit Insurance Corporation."  (emphasis added).  The district court further instructed the jury to consider each of the 14 counts against Barber separately, as "[the] verdict on any one count will not determine [the] verdict on any other count."

During their deliberations, the jury submitted a written question to the district court: "Does submitting a different tax return to a bank than what was filed with the IRS automatically make it a false tax return?"  The district court reasoned

14

that the untrue statement given to Wachovia Bank was not the amount of income, but that the submitted return was the return that Barber had filed with the IRS. The jury could find that the submission of a counterfeit tax return constituted an implicit false statement. Accordingly, the district court gave the jury the following answer: "You must decide based on the evidence and my earlier instructions whether tax returns submitted to a bank was [sic] false. I cannot answer your question more specifically."

The jury found defendant Barber guilty on all 14 counts.

## D.    Motion for Judgment of Acquittal

Defendant Barber orally moved for a judgment of acquittal on all counts based on sufficiency of the evidence, pursuant to Federal Rule of Criminal Procedure 29.

As to the conspiracy count, Barber contended that the government "failed to make a prima facie case or a case that a reasonable jury would . . . agree was sufficient proof of guilt," but did not elaborate on that argument. As to the tax fraud and related wire fraud counts, Barber argued that (1) the government failed to identify the number of tax returns filed when Goldsmith was leasing and running the business in 2010, and (2) the evidence did not show that Barber personally filed, directed, or otherwise influenced the filing of false tax returns.

15

As to the false-statement counts, defendant Barber argued that there was more evidence to show that the copies of the tax returns he submitted to Wachovia Bank reflected his true income. Barber ran "multifaceted enterprises" and prepared thousands of tax returns over a four-year period, making about $300 in fees per return. Moreover, Wachovia Bank did not consider whether Barber filed a tax return in making its loan decision.

The district court denied defendant Barber's motion for a judgment of acquittal on the conspiracy count, finding sufficient evidence for a reasonable jury to conclude that Barber conspired with Davis and Anthony to submit false tax returns. The district court took Barber's motion under advisement on the remaining counts.

On April 11, 2013, the district court entered a written order denying Barber's motion for a judgment of acquittal in its entirety. As to the tax and wire fraud counts, there was sufficient evidence that Barber either directly committed or participated in each crime, or that each crime was committed by a co-conspirator during and within the scope of the conspiracy. As to the false-statement counts, the district court acknowledged Barber's argument that it was at least as likely that Barber filed false tax returns with the IRS as that he submitted false returns to Wachovia Bank. Nonetheless, the jury could have reasonably concluded that Barber's submission of a tax return to Wachovia Bank was a false representation

16

that the return was authentic, regardless of whether the actual information on the unauthentic return was accurate.

## E.    Sentencing

According to the presentence investigation report ("PSI"), defendant Barber's tax fraud scheme caused an actual loss of $131,781 to the government, with an intended loss of $791,405.

The PSI grouped the conspiracy, tax fraud, and wire fraud counts together and recommended three adjustments to the base offense level of 7: (1) a 14-level increase under U.S.S.G. § 2B1.1(b)(1)(H) for an intended loss greater than $400,000 but less than $1,000,000, (2) a 2-level increase under U.S.S.G. § 2B1.1(b)(11)(A)(ii) for the possession or use of an authentication feature (social security numbers), and (3) a 4-level role increase under U.S.S.G. § 3B1.1(a) for being an organizer or leader of a criminal activity that involved five or more participants.  Because the false-statement counts, which were grouped separately, did not affect Barber's guidelines range, we do not discuss those calculations.

Defendant Barber's total offense level of 27 and his criminal-history category of III yielded an advisory guidelines imprisonment range of 87 to 108 months.  However, due to the applicable statutory maximum sentences, the guidelines range was 60 months on the conspiracy count and 36 months on the tax fraud counts.

Relevant to this appeal, defendant Barber objected to (1) the PSI's calculation of the intended loss amount and corresponding 14-level increase in his offense level, and (2) the 4-level role increase for being an organizer or leader of the crime.

At Barber's sentencing hearing, the district court addressed Barber's PSI objections. First, Barber argued that the loss calculation was too speculative because it failed to consider the possibility that portions of the tax returns and some of the HSH designations were legitimate. The government called Franzen, who had testified at trial, concerning the loss amount.

At sentencing, Franzen described in detail the method by which he calculated the estimated loss. Franzen reviewed 434 returns that reported HSH income, filed during tax years 2006 to 2008 by Barber's business. Of those, Franzen chose 105 returns at random to represent the set of 434 returns. Each of the 105 sample returns was put into a software program that calculated the refund owed on the return as filed. Franzen removed the reported HSH income from each sample return to determine the refund owed without the inclusion of HSH income. The average fraudulent refund of $1,823.41 for the 105 sample returns was then projected onto the set of 434 returns. This method yielded a total amount of $791,405.96 of tax due for the 434 returns.

18

Franzen only adjusted the HSH income because it was unusual to see that type of income listed on a return, much less on 434 tax returns prepared by one business over a few years. In ten years of working for the IRS, Franzen never personally saw a return that included HSH income. Franzen did not know whether the 105 sample returns were audited to determine if any of the HSH income designations were legitimate. However, the 35 returns that were included in the original indictment reported fictitious HSH income, none of which was legitimized by the tax payers during the course of the investigation.

The district court found that the evidence reasonably supported a loss amount of over $700,000, which was in fact "very conservative." The district court noted that defendant Barber and his employees listed fictitious HSH income "on return after return," in round numbers, and often used the same number, particularly $7500. It was therefore reasonable to extrapolate the loss from a random sample of the 434 returns, all of which reported HSH income. Franzen's estimate only calculated the effect of the HSH income and did not include any other fraudulent entries, such as false Schedule C income or education credits, or any false returns filed in other tax years. Because it was "virtually certain that the actual intended tax loss exceeded" $700,000, the district court overruled Barber's objection to the loss amount and 14-level increase.

19

Second, with respect to the role increase, defendant Barber argued that he only supervised tax preparers at a legitimate business, and that the evidence failed to show that he instructed, supervised, or led any illegal conduct. The government referred to the trial evidence of Barber's leadership role.

The district court found that Barber was "the organizer and leader, not just a supervisor or manager" of the fraud scheme, which clearly involved five or more participants. Barber set up the operation, benefited from it, hired the tax preparers, taught his preparers, and was "plainly in charge." The factors identified in the sentencing guidelines supported concluding that Barber was the organizer of the scheme. Accordingly, the district court overruled Barber's objection to the four-level role increase.

Based on the district court's rulings, Barber's total offense level was 25,[3] and his guidelines range was 70 to 87 months. The district court sentenced Barber to a total of 87 months' imprisonment: 60 months on the conspiracy count, 36 months on the tax fraud counts, and 87 months on the wire fraud and false-statement counts, to run concurrently.

---

[3]The district court sustained Barber's objection to the two-level increase for use of an authentication feature, reducing the total offense level previously calculated in the PSI by two levels.

20

## III.  SUFFICIENCY OF THE EVIDENCE

On appeal, defendant Barber argues that the district court erred in denying his motion for judgment of acquittal because there was insufficient evidence to support all of his convictions.  As discussed below, Barber's arguments lack merit.

We review de novo both a challenge to the sufficiency of the evidence and the district court's denial of a Rule 29 motion for a judgment of acquittal.  United States v. Gamory, 635 F.3d 480, 497 (11th Cir. 2011).

In evaluating sufficiency, we view the evidence in the light most favorable to the government, with all inferences and credibility choices made in the government's favor.  Id.  We affirm the conviction if, based on this evidence, a reasonable jury could have found the defendant guilty beyond a reasonable doubt.  Id.  This standard does not require the evidence to be "inconsistent with every reasonable hypothesis other than guilt," as we permit the jury to choose among several reasonable conclusions that could be drawn from the evidence.  United States v. Hunt, 526 F.3d 739, 745 (11th Cir. 2008).

### A.    Making False Statements

As to his false-statement convictions, defendant Barber argues that the government failed to prove that the tax returns submitted to Wachovia Bank were actually false.  According to Barber, it was more likely that he provided accurate returns to Wachovia Bank and false returns to the IRS than the other way around.

21

In relevant part, § 1014 proscribes the making of "any false statement," made for the purpose of influencing a federally insured financial institution "in any way."  18 U.S.C. § 1014 (emphasis added).  To sustain a conviction for making false statements under § 1014, the government must prove that (1) "the defendant made a false statement or report," and (2) "that he did so for the purpose of influencing in any way the action of [a described financial institution] upon any application . . . or loan."  Williams v. United States, 458 U.S. 279, 284, 102 S. Ct. 3088, 3091 (1982) (quotation marks omitted).  Because Barber contests only the falsity of his statements, we focus our discussion on that element of § 1014.

In United States v. Simmons, 503 F.2d 831 (5th Cir. 1974),[4] the former Fifth Circuit rejected a defendant's challenge to the sufficiency of the evidence supporting his § 1014 conviction for making false statements to a federal bank.  In Simmons, the tax return provided to the bank in support of a loan application misstated the defendant's income and also was never filed with the IRS.  Id. at 833-34, 837.  In affirming the conviction, the Fifth Circuit explained that (1) the defendant's testimony demonstrated that the reported amounts of tax and income on the return were false, and (2) "[t]he evidence also showed that the return was not as represented, a genuine return.  It was never filed with the [IRS]."  Id. at 837.

---

[4]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all Fifth Circuit decisions handed down before October 1, 1981.

To the extent that Simmons does not squarely foreclose Barber's argument, we find its rationale to be persuasive.

Viewing the evidence in the light most favorable to the government, a reasonable jury could have found Barber guilty of knowingly making false statements to a financial institution within the meaning of § 1014. Virtually conclusive evidence established that all copies of the individual and corporate tax returns that Barber submitted to Wachovia Bank in connection with his loan applications reported substantially greater income than the returns Barber filed with the IRS for the same tax years. The jury could have reasonably concluded that, by submitting documents purporting to be his tax returns, Barber represented to Wachovia Bank that those documents were copies of the same returns he actually filed with the IRS under penalty of perjury. That implied representation—that the returns were authentic—was false. Under this construction, the government was not also required to prove the actual falsity of the income reported in the returns given to Wachovia Bank.

Our conclusion is consistent with persuasive authority from other circuits. See United States v. Hicks, 217 F.3d 1038, 1042-44 (9th Cir. 2000); United States v. Darrah, 119 F.3d 1322, 1327 (8th Cir. 1997). It also comports with the plain language of § 1014, which criminalizes the making of "any" false statement that meets the other requirements in the statute. See 18 U.S.C. § 1014; see also United

23

States v. Wells, 519 U.S. 482, 489-90, 117 S. Ct. 921, 926-27 (1997) (relying on the term "any" to support holding that the materiality of the false statement is not an element under § 1014).

For these reasons, we conclude that the district court did not err in denying Barber's motion for a judgment of acquittal on the false-statement counts.

## B.    Remaining Convictions

As to his remaining convictions for conspiracy, tax fraud, and wire fraud, Barber summarily asserts in his counseled brief that the district court erred for the reasons "expressed by defense counsel" at trial in support of Barber's motion for a judgment of acquittal.  To support these conclusory assertions, Barber quotes from the trial transcript without further discussion or citation to authority.

We are inclined to hold that Barber abandoned any challenge to the sufficiency of the evidence to support his convictions for conspiracy, tax fraud, and wire fraud by failing to adequately brief those claims.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

Alternatively, even if Barber did not abandon these issues, we also conclude that the district court correctly denied his motion for judgment of acquittal because

24

the evidence was more than sufficient to sustain Barber's conspiracy, tax fraud, and wire fraud convictions.

First, the government presented ample evidence that (1) Barber and Davis agreed to impede the IRS; (2) Barber's participation in that agreement was knowing and voluntary; and (3) both Barber and Davis committed acts in furtherance of the agreement, including the preparation and filing of false tax returns. See United States v. Adkinson, 158 F.3d 1147, 1153 (11th Cir. 1998) (setting forth the elements of a conspiracy conviction under 18 U.S.C. § 371).

Second, the government presented ample evidence that Barber (1) willfully and knowingly aided or assisted (2) in the preparation or filing of tax returns (3) that contained material statements that Barber knew to be false. See United States v. Kottwitz, 614 F.3d 1241, 1269, withdrawn in part on other grounds, 627 F.3d 1383 (11th Cir. 2010) (setting forth the elements of a tax fraud conviction under 26 U.S.C. §7206(2)).

Third, the government presented ample evidence that Barber (1) intentionally participated in a scheme to defraud the IRS of money, and (2) used or caused the use of wires to execute the scheme (i.e. by electronically submitting the aforementioned false tax returns to the IRS). See United States v. Rodriguez, 732 F.3d 1299, 1303 (11th Cir. 2013) (setting forth the elements of a wire fraud conviction under 18 U.S.C. § 1343).

25

## IV.  MOTION TO SEVER FALSE-STATEMENT COUNTS

Defendant Barber argues that the district court abused its discretion by denying his motion to sever the false-statement counts from the conspiracy, tax fraud, and wire fraud counts, as they were improperly joined under Federal Rule of Criminal Procedure 8(a).  According to Barber, the improper joinder allowed the jury to use evidence of one crime to infer that he also committed the other crime.

To determine whether separate charges were properly tried at the same time, we undertake a two-step analysis: (1) we first review de novo whether the initial joinder was proper under Rule 8(a), and (2) then review the denial of a Rule 14 motion to sever for abuse of discretion.  United States v. Barsoum, 763 F.3d 1321, 1336 (11th Cir. 2014).  As to the second step, we will reverse the denial of a motion to sever only if the defendant meets the heavy burden of showing that "he received an unfair trial and suffered compelling prejudice."  Id. at 1337 (quotation marks omitted).

Under Rule 8(a), an indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are [1] of the same or similar character, or are [2] based on the same act or transaction, or are [3] connected with or constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).  Rule 8(a) is construed broadly in favor of initial joinder.  Barsoum, 763 F.3d at 1336-37.

However, if the Rule 8(a) joinder of offenses appears to prejudice a defendant, the district court may order separate trials of counts. Fed. R. Crim. P. 14.

First, the false-statement counts were properly joined with the conspiracy, tax fraud, and wire fraud counts in a single indictment. The knowing submission of false statements to a federally insured financial institution, the offense charged by the false-statement counts, was substantially similar in character to the preparation and filing of false tax returns with the IRS. Both categories of offenses were crimes of deceit and related in time. We are not persuaded by Barber's argument that the false-statement counts concerned only his individual tax returns, whereas the remaining counts implicated returns prepared for clients by his business.

Second, even assuming arguendo that the counts were improperly joined under Rule 8(a), any such error was harmless. The evidence of Barber's guilt as to the conspiracy, tax fraud, and wire fraud counts was overwhelming. See United States v. Dowd, 451 F.3d 1244, 1250 (11th Cir. 2006). Even if the counts had been tried separately, the district court would have admitted the false-statement evidence as relevant to show Barber's intent or knowledge of the tax fraud scheme. See Fed. R. Evid. 404(b)(2) (evidence of other acts may be admissible for a purpose other than proving conduct in conformity therewith, such as to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of

27

mistake, or lack of accident"); United States v. Watson, 866 F.2d 381, 385 (11th Cir. 1989) (any misjoinder was harmless error because evidence presented to convict on one set of counts would have been admissible in a separate trial on the other set of counts). Similarly, evidence that Barber prepared false returns for his clients would likely have been admissible under Rule 404(b)(2).

In any event, the district court expressly instructed the jury to consider each count against Barber separately. See United States v. Slaughter, 708 F.3d 1208, 1213 (11th Cir. 2013) (noting that severance is not required when the possible prejudice may be cured by a cautionary instruction). Under these factual circumstances, we cannot say that Barber "received an unfair trial and suffered compelling prejudice." See Barsoum, 763 F.3d at 1337. The district court did not abuse its discretion in denying Barber's motion to sever the false-statement counts.

## V. SENTENCING ISSUES

Barber raises two sentencing issues on appeal. He argues that the district court erred in overruling his objections to the loss amount and role increases in his offense level calculation.

We review de novo the district court's interpretation and application of the sentencing guidelines, and for clear error its factual findings used to calculate a defendant's guideline range. Rodriguez, 732 F.3d at 1305; see United States v. Barrington, 648 F.3d 1178, 1197 (11th Cir. 2011) (reviewing loss determination

for clear error); United States v. Ndiaye, 434 F.3d 1270, 1304 (11th Cir. 2006) (reviewing determination of defendant's role in the crime for clear error).  When a defendant challenges a factual basis of his sentence, the government must present "reliable and specific" evidence to meet its burden of establishing the disputed fact by a preponderance of the evidence.  Rodriguez, 732 F.3d at 1305.

## A.    Role Increase

Barber argues that the government failed to prove that Barber was an "organizer or leader" as required to impose the four-level role increase.

The guidelines provide for a four-level increase to the defendant's base offense level if he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  To determine whether the defendant was an organizer or leader, courts should consider the following factors: (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.  Id. cmt. n.4; see United States v. Caraballo, 595 F.3d 1214, 1231 (11th Cir. 2010) (noting that many cases imposing a § 3B1.1(a) increase for a leadership or organization role involved "evidence that the defendant had recruited

participants, had instructed participants, or had wielded decision-making authority").

Here, ample evidence supports finding that Barber was an "organizer or leader" of the tax fraud scheme. Barber owned both KLB Group and KBA, operated the Brevard Street office, and hired employees with no prior experience in tax preparation. Barber actively trained and encouraged his employees to prepare false tax returns, and to perpetuate and attempt to conceal the fraud after the IRS's first compliance check. Although co-conspirators Davis and Anthony also taught other employees how to prepare fraudulent returns, they did so at Barber's direction. All preparation fees from clients went into business accounts controlled by Barber, other than any payment for a false dependent given directly to an individual preparer. It is clear that Barber had decision-making authority and exercised control over a significant criminal operation. Thus, we conclude that the district court did not clearly err in applying the four-level role increase under § 3B1.1(a).

## B. Loss Amount Calculation

Barber also argues that the government should have been able to determine the actual loss amount based on all 434 tax returns that reported HSH income, rather than estimating from a sample of only 105 returns.

In fraud cases like Barber's, the guidelines provide for a 14-level increase to the defendant's base offense level if the total loss from the offense is more than $400,000 but less than $1,000,000. U.S.S.G. § 2B1.1(b)(1)(H); see id. cmt. n.3(A) (holding the defendant responsible for the greater of the actual or intended loss). A district court "need only make a reasonable estimate of the loss" based on available information and "is in a unique position to assess the evidence and estimate the loss based upon that evidence." Id. cmt. n.3(C) We must therefore give appropriate deference to a district court's loss calculation. United States v. Bradley, 644 F.3d 1213, 1290 (11th Cir. 2011). The district court is not required to "constrain itself to absolute figures" and instead "may rely on specific circumstantial evidence to estimate the amount of loss." Id. (quotation marks omitted).

Here, the loss calculation took into account only the 434 returns filed for tax years 2006 through 2008 that reported HSH income, a rare type of income. The calculation did not reflect any loss stemming from other falsely-reported information such as Schedule C income and expenses, deductions, credits, dependents, or filing statuses, and did not include any returns filed outside of a three-year period. As the district court found, this calculation yielded a very conservative loss figure given the thousands of fraudulent returns filed by Barber's business over the course of the scheme. The district court properly relied on

31

specific circumstantial evidence to make a reasonable estimate of the total intended loss based on available information.  That estimate is entitled to appropriate deference.  We therefore conclude that the district court did not err—much less clearly err—in its loss calculation of $791,405.96 and in applying the 14-level increase under § 2B1.1(b)(1)(H).

## VI.  CONCLUSION

For the foregoing reasons, we affirm Barber's convictions and sentences.

**AFFIRMED.**